# In the United States District Court
## for the Southern District of Georgia
## Brunswick Division

CHRISTOPHER P. WESOLOWSKI,

    Plaintiff,

    vs.

JANET NAPOLITANO, Secretary,
United States Department of
Homeland Security,

    Defendant.

CV 211-163

## ORDER

Presently before the Court are four motions: Defendant's Motion for Summary Judgment as to Count 1, Dkt. No. 55; Defendant's Motion for Summary Judgment as to Count 2, Dkt. No. 56; Defendant's Motion for Summary Judgment as to Count 3, Dkt. No. 57; and Plaintiff's Motion to Strike Defendant's Motions for Summary Judgment, Dkt. No. 59. For the reasons stated below, Plaintiff's motion is **DENIED**, and Defendant's motions are **GRANTED**.

## I. Factual Background

This case arises from alleged workplace harassment of a federal law-enforcement instructor and his claims that he was

AO 72A
(Rev. 8/82)

retaliated against for engaging in EEO activity. The relevant facts are taken principally from Defendant's Statements of Material Facts and Plaintiff's responses thereto. See Dkt. Nos. 55-2; 56-27; 57-2; 71-2; 71-3; 71-4. Pursuant to Federal Rule of Civil Procedure 56(e) and Local Rule 56.1, all material facts not controverted by specific citation to the record are deemed admitted, unless otherwise inappropriate. Where the parties offer conflicting accounts of the events in question, this Court draws all inferences and presents all evidence in the light most favorable to the plaintiff. See Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316, 1318 (11th Cir. 2012) (citing Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011)).

A. Events Prior to the First Selection Process

1. Work Before Harassment Began

In 2004, Plaintiff Christopher Wesolowski was hired as a Lead Firearms Instructor at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia. Dkt. No. 27 ¶ 14. In April 2007, he transferred to the Tactics Branch ("TAB") of FLETC's Enforcement Operations Division. Id. ¶ 15. He remained there until he transferred out of the branch in late 2008, as a result of events that began in February of that year.

AO 72A
(Rev. 8/82)

### 2. Crabill's Remarks About Plaintiff

Around February 2008, male instructors began to ridicule Wesolowski for having long hair and wearing earrings. Id. ¶ 18. On March 17, 2008, Wesolowski's fellow instructor, Tom Crabill, harassed Plaintiff about his appearance in front of students. Dkt. No. 71, at 6-7. Plaintiff had heard from others that Crabill was saying Plaintiff's hair was "unsat," and that Plaintiff was "unprofessional," "a piece of shit," and a "leadership problem." Dkt. No. 71-2 ¶ 107. To Plaintiff directly, Crabill said, "[W]hat the fuck is up with that hair? What is all that about? Who are you trying to be? What, you think you're undercover? Oh, you just want everybody to think you're undercover." Id. ¶ 108. Plaintiff believes that the comments about his appearance would not have been made if he was a woman. Id. ¶ 105. Later that month, Plaintiff also learned that Crabill and another coworker, Bob Pitchford, were calling him a snitch. Dkt. No. 71, at 9.

Before Plaintiff grew his hair and Crabill began disparaging his appearance, Crabill knew Plaintiff socially, invited him to dinner in his home, and had social contact with him at motorcycle events and motorcycle-club functions. Dkt. No. 71-2 ¶ 10. Rather than intending to harass Plaintiff, Crabill claims that he was worried about Wesolowski's appearance at work because he was "wearing what appeared to be orange like

fire fighter pants, his hair was in a bun in the back, [he was] unshaven, and [he was wearing] what appeared to be five earrings. Not the norm for what he was normally groomed and dressed like." Id. ¶ 11.

### 3. Plaintiff's Complaint to Lambraia About Crabill

Wesolowski notified his management chain, including Branch Chief Tony Lambraia and Division Chief Randy Melvin, that he was being harassed by Crabill. Dkt. No. 27 ¶ 22. On April 3, 2008, in response to Wesolowski's complaint, Lambraia held a meeting with Plaintiff and Crabill.[1] Dkt. No. 71-2 ¶ 8. To Plaintiff's knowledge, this was management's only response to Plaintiff's complaint that Crabill was causing problems. Wesolowski Dep., at 40:8-9.

The meeting was held at least a week after Plaintiff informed Lambraia that Crabill was disparaging his appearance. Id. at 40:10-21. According to Plaintiff, Crabill lied at the meeting: "He denied that he was saying any of those things, and, of course, he tried to say that he was trying to be my friend, trying to be my pal when nothing that he said is something that any pal or friend would say." Id. at 41:1-11. Although Wesolowski spoke up for himself in the meeting, he thought that "it was useless trying to have [a] conversation with [Crabill] when [he knew that Crabill was] going to sit there and lie to

---

[1] Plaintiff secretly recorded this meeting. Dkt. No. 71-2 ¶ 8.

AO 72A
(Rev. 8/82)

[his] face." Id. at 41:17-23. Lambraia stated that he had never counseled Wesolowski about his appearance and that if Crabill was telling people that he had, then Crabill was telling a "flat out lie." Id. at 42:2-10.

Overall, the meeting's big picture was that they had a mission, and Lambraia asked if Crabill and Wesolowski could "work professionally with each other without having to deal with [issues] any further." Id. Wesolowski said that he could not "work with anybody that consistently belittles [him] and makes it impossible for [him] to come to work not knowing what to expect"; rather, he needed to "come to work with the expectation of being able to do [his] work unaffected and without having somebody poison the well every time [he] turn[s] around." Id. at 11-16. Indeed, "[t]here was a promotion coming up, and [he] had to be concerned with that." Id. at 42:17-18. Lambraia listened as Wesolowski talked. Id. at 42:19-22. At the end of the meeting, with all three present, Lambraia repeated that "we have a mission to do, you need to be professional, and [Crabill's actions] will not be tolerated." Id. at 42-43.

4. Brad Smith's Uniform Policy

Brad Smith was the Deputy Assistant Director in FLETC's Training Directorate from March 2004 to March 2008, where he was a supervisor over the Enforcement Operations Division (EOD). Dkt. No. 71-2 ¶ 1. Smith knew Plaintiff professionally but, as

a third-line supervisor, he had minimal professional contact with him and did not socialize with him. Id. ¶ 2. In the 2007-2008 time frame, as part of "the normal updating procedures," Smith was "leading the effort" to revise the FLETC uniform directive that had reached its sunset date in 2006. Id. ¶ 3. In the course of doing so he sought input from managers and employees, and some employees expressed concerns that the issued uniforms and gear were not sufficient for applicable work environments. Id. ¶ 4. Smith claims that he has not used Plaintiff or any other employee as an example to promote a uniform policy and that he has no "ax to grind" with Plaintiff.[2] However, according to Plaintiff, Lambraia had told Plaintiff that Smith had been trying to push the dress code policy and had brought Plaintiff "up in front of numerous people as an example of what not to look like." Wesolowski Dep., at 38-39. Further, Mossburg and Lambraia mentioned that someone from senior management had tried to convince Lambraia to counsel Wesolowski and try to get him on track with what the new policy was going to be. Id. at 39:1-6. Plaintiff has not alleged or sworn that he heard Smith's purported comment; rather, he heard of it only after it was relayed from Lambraia. Dkt. No. 71-2 ¶ 7.

---

[2] Smith also testified that he has no resentment toward Plaintiff, "that he did not discriminate against Plaintiff based on his sex, on a hostile work environment, or in retaliation," and that he was not aware whether Plaintiff filed an EEO complaint. Dkt. No. 71-2 ¶ 5. Further, he has no knowledge of any positions for which Plaintiff applied and was not involved in any decisions regarding Plaintiff's applications for promotion. Id. ¶ 6.

### 5. Pitchford's Reports About Plaintiff

On April 11, 2008, Pitchford and Plaintiff had a disagreement about Plaintiff's apparent failure to report to teach a class. Dkt. No. 71-3 ¶ 27. Pitchford prepared a memo about the disagreement. Id. ¶ 28. In the memo, Pitchford wrote that when he was told that Plaintiff was not present, he called Plaintiff's cell phone and got his voice mail, checked the call line (on which employees are to report any unexpected absence) several times, and then sent another instructor to cover the class. Id. ¶ 29. Later that day, Plaintiff called him and said that he had called the call line twice but reached the voicemail of someone else, stating that the number did not work. Id. ¶ 32. Pitchford wrote in the memo that Plaintiff had called the wrong number (2635, rather than 6235). Id. ¶ 33. Plaintiff was not hostile and did not challenge Pitchford. Dkt. No. 71-43 ¶ 22. Although Pitchford says he only wanted to ensure Plaintiff's work status and that he was all right, others had reported to Plaintiff that Pitchford was claiming that Plaintiff was absent without leave and that Pitchford was going to report him to the Special Investigations Division (SID). Id. ¶ 23.

The same day, Pitchford told Chief Security Officer Ronnie Edge that Wesolowski was "pimping [himself] out as a GS-15 criminal investigator" and that he had grave concerns because he felt Plaintiff was acting illegally and "guys in the unit [were]

talking about it." Wesolowski Dep., at 64:6-12; Dkt. No. 71-2 ¶ 21. Pitchford felt that something needed to happen about Wesolowski telling people that he was actively working an investigation for the SID. Wesolowski Dep., at 64:12-16. Pitchford claims that several coworkers—Crabill, Ron Rods, and Tony Barber—told him that Plaintiff was telling them that he was working for SID and was undercover. Dkt. No. 71-2 ¶¶ 14, 19. Wesolowski denies that this is true and alleges that Pitchford and Crabill created the rumor. Id. ¶ 14. Pitchford swears that he told Edge that he had not heard Wesolowski make the assertions, but Plaintiff denies that this is accurate. Id. ¶¶ 16, 20.

According to Edge, in response to Pitchford's concerns, he asked whether Pitchford had gone to Dave Behrend, the Division Chief of the SID. Dkt. No. 55-11, at 14:17-22. After Pitchford said he had not, Edge recommended that he go speak to Behrend. Id. at 14:23-24. Edge felt that Behrend, as Chief of SID, should be apprised of the rumor. Dkt. No. 71-2 ¶ 22. However, according to Pitchford, Edge said he was going to talk to Behrend about it, and to avoid the situation from being "blown out of context," Pitchford reported his conversation with Edge to Lambraia. Id. ¶ 18. Two to four days later, Edge asked Behrend if Pitchford had come to him about the matter, learned that Pitchford had not, and told Behrend himself what Pitchford

had told him.  Id. ¶ 23.  Behrend said that he would look into

it.  Id.

On April 16, 2008, Melvin and Lambraia approached Edge and discussed ongoing "personality issues and conflicts" between Wesolowski and another instructor; in turn, Edge advised them of what Pitchford had told him on April 11.  Id. ¶ 24; Dkt. No. 71-7, Ex. 2.  When asked by Melvin and Lambraia whether it was inappropriate for Plaintiff to raise the issue with Edge first instead of them, Edge told them that people approached him with information about administrative or potentially criminal issues on a regular basis.[3]  Dkt. Nos. 71-2 ¶ 25; 55-11, at 21:8-15.

### 6. Wesolowski's Complaint to Lambraia

On April 15, 2008, Plaintiff sent an email to Lambraia. Dkt. No. 71-2 ¶ 26.  In the email, Plaintiff expressed frustration with his work environment and the continuation of "defamatory comments."  Id.  Plaintiff said that he had received a phone call from the SID that morning to alert him that "an unnamed and reliable source" had called Behrend to tell him that Pitchford was telling people that Wesolowski was posing as an SID investigator and claiming to be a GS-15 employee.  Id. Wesolowski denied any truth to Pitchford's assertions, concluded

---

[3] Plaintiff claims that it was inappropriate for Pitchford to "knowingly share false information" about Wesolowski with the head of FLETC security.  Dkt. No. 71-2 ¶ 25.

AO 72A
(Rev. 8/82)

that "this has in fact become a hostile work environment for me," and asked for "an appropriate resolution." Id.

The April 15 email asserting that Plaintiff was experiencing a "hostile work environment" says nothing about the allegedly hostile work environment being related to Plaintiff's gender, to his gender non-conformity, or to "sex-stereotyping." Id. ¶¶ 109-110. However, Plaintiff contends that Lambraia clearly understood that the complaint also involved the harassment about his appearance, especially after there were two subsequent meetings to address Plaintiff's issues. Id. Thus, to show that the complaint was gender-based, Plaintiff apparently relies on an implicit existence of gender stereotyping from the attacks on his appearance and Smith's uniform policy. Id. ¶¶ 111-12. Although the attacks on Plaintiff's appearance were not in regard to him being "unmanly," "girly," "effeminate," "inappropriate for a man," or otherwise exhibiting gender non-conformity, Plaintiff maintains that the same comments would not have been made if he was a woman. See id. ¶ 113 (citing Wesolowski Dep., at 199:5 ("I don't believe that if I had been female I would have been subjected to the same line of ridiculous questions and comments from other instructors regarding my appearance.")). Further, although Plaintiff has not alleged that Pitchford made the "false rumor" report based upon Plaintiff's gender or a gender

AO 72A
(Rev. 8/82)

non-conforming appearance, he contends the false rumor was in reprisal of protected opposition activities.  Id. ¶ 115.

7. Management Inquiry into Wesolowski's Complaints

In response to the email, and after being advised by legal counsel, Lambraia and Melvin conducted a management inquiry into Plaintiff's claim of hostile work environment by speaking to some of the other instructors in the Tactics Branch.  Id. ¶¶ 28-29.  The inquiry included interviews of Plaintiff, Crabill, Pitchford, Edge, Tony Barber, and Jamie Hodge, among others. See id. ¶ 30.  After reviewing the information and being advised by the Chief Counsel's Office, Lambraia and Melvin found that Plaintiff's claim of hostile work environment could not be substantiated.  See id. ¶¶ 29, 31.

On April 30, 2011, Lambraia emailed Plaintiff to notify him of the inquiry's actions and findings.  Id. ¶ 35.  The email states that Melvin and Lambraia had interviewed Plaintiff and several others, and from these interviews, others said they "were just trying to help" Plaintiff and were "just kidding" about Plaintiff being undercover.  Id.  The email also spoke to Pitchford's discussion with Edge and said that the scheduling dispute with Pitchford was a misunderstanding rather than motivated by malice.  See id. ¶ 37.  Lambraia wanted to speak to Plaintiff "to make sure that [they] ha[d] a mutual understanding and [were] able to continue forward."  Id. ¶ 38.

AO 72A
(Rev. 8/82)

After the inquiry concluded, Lambraia came to Plaintiff and asked how he was doing. Wesolowski Dep., at 77:5-9. Plaintiff told Lambraia that he felt isolated and that his being unwelcome by others was obvious. Id. at 77:10-13. In response, Lambraia asked, "To what end are you going to take this? To what end do you plan on continuing to pursue this?" Id. at 77:14-19. Wesolowski does not believe Lambraia was genuinely concerned about him or his well-being. See Dkt. No. 71-2 ¶ 29.

B. First Selection Process

1. General Process

In May, there was an announcement for a Senior Instructor position ("the May Position") that was open only to FLETC employees.[4] See Dkt. No. 71-3 ¶ 5. On May 16, 2008, Wesolowski applied for the May Position. Dkt. No. 71-9, at 29. Crabill applied for the same job. See Dkt. No. 71-10. A certificate of eligible applicants included Wesolowski, Crabill, and Tony Barber. Dkt. No. 27 ¶ 32. Wesolowski was interviewed in June 2008. Id. ¶ 33.

---

[4] FLETC issues vacancy announcements, which specify the position title, series and grade, who may apply, and the time period within which applications will be accepted. Dkt. No. 71-3 ¶ 1. Applications are submitted online through USAJOBS with an online resume. Id. ¶ 2. Applications include a self-assessment by the applicant that results in an automatic ranking, and the announcement gives notice to the applicant that the ranking may be manually adjusted if the online resume does not support the self-assessment. Id. ¶ 3. Certificates of eligible applicants and their applications are sent to management in alphabetical order, and the certificates specify that management is allowed the discretion to conduct interviews. Id. ¶ 4.

AO 72A
(Rev. 8/82)

Interviews were conducted and applicants were assessed by a panel that included Lambraia, Adrianna Roddini,[5] and Bill Mossburg.[6] Id. Melvin was the selecting official to whom the panel's recommendation was made. See id. For final approval, the selection was submitted to Dennis Keith, Deputy Assistant Director of the Office of Training Operations. Dkt. No. 56-4, Ex. B, at 5.

### 2. Panel's Reasons for Not Selecting Plaintiff

Crabill was ultimately recommended for the position. Dkt. No. 71-3 ¶ 7. Lambraia swears that two sets of interviews were done; the same five questions, taken primarily from the vacancy announcement, were asked of all applicants; the panel members took notes on prepared forms; and the panel then engaged in a discussion based upon interview performance and resumes. Dkt. No. 71-2 ¶ 43. Further, each panel member viewed Crabill as the best candidate and agreed that he should be selected. See id. ¶¶ 44, 50, 63, 81-82. Crabill was the top candidate even after Lambraia was told to reconvene, and actually did reconvene, the panel for additional interviews of people from outside the branch. Id. ¶ 81.

---

[5] Lambraia testified that he chose Roddini because of her knowledge, field experience, and impartiality, and because she did not know the applicants. Dkt. No. 71-2 ¶ 41. Plaintiff contends this testimony is not credible. Id.
[6] Lambraia testified that he chose Mossburg because of his excellent knowledge and field experience, his role as a Senior Instructor in the branch that gave him first-hand knowledge of the job requirements, his role as a Union representative at FLETC, and his impartiality and fairness. Dkt. No. 71-2 ¶ 42. Plaintiff contends this testimony is not credible. Id.

AO 72A
(Rev. 8/82)

All panel members and Melvin deny that a candidate's engagement in EEO activity affected their decision. Although Lambraia denies being aware that Plaintiff was engaged in EEO activity or that such activity was considered in making his decision, Wesolowski disputes this based on Lambraia's involvement in the management inquiry of Wesolowski's complaints. Id. ¶ 46. Similarly, although Melvin testified that he was unaware whether Plaintiff had engaged in EEO activity and that he did not consider such activity in approving the panel's decision, he was also involved in the management inquiry into Wesolowski's complaints. See id. ¶¶ 88-90. As to Roddini, she swears that she was unaware of any EEO activity and denies that such activity impacted her decision. Id. ¶ 60. Finally, Mossburg admits that Wesolowski advised him that he had filed a complaint against several coworkers for harassing him because of his earrings and hair, but was "not aware of what level of complaint or if he had filed with EEO." Id. ¶ 62.

Instead of citing Wesolowski's asserted EEO activity, the panel members unanimously justify their decision based on the candidates' comparative qualifications and Wesolowski's poor interview performance. More specifically, the panel found Crabill to have greater experience, a better application, and better responses to the panel's questions, while Wesolowski was negative about past jobs and answered one question by saying he

had already answered it in a previous response. Id. ¶¶ 45, 49, 61, 63.

In turn, Plaintiff asserts that Defendant's evidence, especially Lambraia's testimony, lacks credibility. See, e.g., id. ¶ 48. Plaintiff emphasizes his belief that Crabill was preselected, which is based on a conversation with Mossburg in which Mossburg said it would be nearly impossible to overcome Crabill's experience.[7] Id. ¶ 44. Finally, Plaintiff contends that Lambraia, given his knowledge of Plaintiff's complaints, tainted the selection process by heading the panel and developing questions, discussing candidates after each interview, and reviewing an ordinal ranking of candidates before recommending a person to Melvin. See id. ¶ 60. However, Mossburg testified that he was not directed by Smith, Melvin, or Lambraia "who the selectee was going to be" and that he did not feel that Lambraia was directing how the candidates would be ranked by the panel. Id. ¶ 87.

### 3. Plaintiff's Interview Inquiry to Mossburg

On September 8, 2008, after Crabill's selection was announced, Wesolowski asked Mossburg how he performed in the interview. Dkt. Nos. 71-8, at 2:7-91; 56-10, Ex. H. Mossburg said that Wesolowski "did fine" and that "it was close." Dkt. No. 71-8, at 2:12; see also id. at 6:2-3 ("Mossburg: Both of you

---

[7] See infra Part I.B.3.

did very good at interviewing." (capitalization altered)).
Because Crabill had been working with the Active Shooter program
and hiring was being made specifically for that program,
Mossburg said that Crabill would "clearly [be able] to answer
[certain] questions better."[8]  Id. at 2:10-19.  Further, although
Crabill and Wesolowski had similar experience, "it started to
split a little bit" when Crabill could talk about his federal
experience as a supervisor for ICE.  Id. at 3:11-22.  Mossburg
went on to say that "[i]t was going to be almost impossible for
[Wesolowski] to get over" Crabill's experience in the Active
Shooter Program, as "it groomed" Crabill for the May Position.
Dkt. Nos. 71-2 ¶ 73; 71-8, at 7:15-21, 8:1-2.

At one point, Mossburg said, "We were actually told then
who the selection was going to be.  I kinda of knew who the
selection was going to be.  I know I couldn't say anything."
Dkt. No. 71-2 ¶ 69.  He went on: "But we could tell then – well,
we were asked simply to rate the applicants based on the
interviews; one, two and three."  Id. ¶ 70.  As to Roddini,
Mossburg said she was "very professional about it" and twice
said she felt "pretty much the same thing."  Id. ¶ 71.  Mossburg
stated that the questions asked in the interviews "were right
off the application" quick-hire questions, and that when

---

[8] Later, at Mossburg's deposition, Mossburg said he would not have given much
higher marks based on participation in the Active Shooter Program.  Dkt. No.
71-2 ¶ 67.

Lambraia "does these things[,] he does them by the numbers."[9]
Id. ¶ 72.  Mossburg also said that he and Lambraia were inclined
toward applicant Tony Barber, but Plaintiff and Crabill were
ahead of him before scoring questions.  Id. ¶ 74.

### C. Aftermath of First Selection Process

#### 1. "Possible Litigation" Email

On September 2, 2008, in an email titled "Possible
Litigation," Melvin memorialized a conversation with Wesolowski
regarding Wesolowski's concern that he did not receive an award
or commendation for an action taken off of FLETC's campus.  Id.
¶ 40.  The writing did not mention any personnel matters or
disputes.  Dkt. No. 71-13.

#### 2. Announcement of Promotion

Crabill was recommended for the position on July 29, and
the selection was approved on August 24, 2008.  Dkt. No. 71-3
¶ 7.  On August 4, 2008, Bob Humkey replaced Lambraia as the
Chief of TAB and became Plaintiff's first-line supervisor.  Id.
¶ 8.  On September 5, 2008, Humkey sent out an email announcing
Crabill's selection, in which he had not participated.  Id. ¶ 9.
It was on this date that Wesolowski says that he first became
aware of the alleged discrimination.  Dkt. No. 71-12, at 3.

---

[9] Plaintiff challenges that the questions were properly done because Mossburg
agreed that "the announcement (and therefore the questions) were written for
Crabill."  Dkt. No. 71-2 ¶ 72.

### 3. Plaintiff's Inquiry to an EEO Counselor

On September 15, 2008, Wesolowski contacted an EEO counselor. Id. The EEO counselor's report shows that the counselor interviewed Humkey on September 30, 2008, for approximately an hour and a half because Humkey was Plaintiff's new supervisor. Dkt. No. 71-4 ¶ 16. Despite the fact that Wesolowski previously told Humkey on September 18, 2008,[10] that he had filed an EEO complaint, Humkey swears that he has only a vague recollection of the interview. Id. ¶ 17. He says it made "little to no impression" on him because his role in the matters was small and the interview was brief. Id. ¶ 18. Humkey swears that he did not develop any animus toward Plaintiff because of the EEO interview or any of Plaintiff's EEO activity, nor does he hold animus toward employees who exercise their rights to make complaints to management. Id. ¶ 19. On October 15, 2008, Plaintiff received his notice of right to file a claim. Dkt. No. 71-12, at 3.

### 4. Workplace Violence Incident with Pitchford

On September 18, 2008, a confrontation occurred between Wesolowski and Pitchford, which Pitchford described in a memo titled "Threat of Bodily Harm/Harassment." Dkt. No. 71-3 ¶ 19. In the memo, Pitchford reported that, while serving as the scheduler of instructor class assignments, he observed that

---

[10] See infra Part I.C.5.

neither Plaintiff nor another instructor were present at the beginning of a class; it appeared that instructor Jamie Hodge was handling the class alone.  Id. ¶ 20.  After trying unsuccessfully to reach the other instructor by phone, Pitchford spoke with Plaintiff and learned that he was present to teach the class.  Id. ¶ 21.  Pitchford then went to fill in as the third instructor for the class, although Plaintiff denies that Pitchford had any reason to be in the training area.  Id. ¶ 22; Dkt. No. 71-43 ¶ 19.  Hodge told Pitchford that he started the class by himself, that Plaintiff had gone to get water bottles, and that it was "no big deal."  Dkt. No. 71-3 ¶ 23.  Hodge then relayed Pitchford's questioning to Plaintiff, such as asking "where [Wesolowski] really [was] th[at] morning."  Wesolowski Dep., at 145:16-21.

During the conversation, Pitchford was present and watching students train.  See Wesolowski Dep., at 146:4-12.  Plaintiff "walked directly up to him" and said, "You got a question.  Why don't you ask me?"  Dkt. Nos. 71-17, Ex. 12; 71-3 ¶ 25. Wesolowski did not come within six inches of Pitchford's face or act in an aggressive manner by puffing out his chest or balling up his fists.  Dkt. No. 71-43 ¶ 20.  They were in front of a group of students, so Wesolowski was trying to be "low key" and keep his voice low; he claims to have made no threat of violence either in words or through his physical presence.  Id. ¶ 20.

19

Pitchford "flew his arms up in the air and started flailing around being real animated, jumping around saying what, what." Wesolowski Dep., at 146:23-25. Plaintiff almost smiled because Pitchford "looked so goofy doing it." Id. at 147:1-2; Dkt. No. 71-3 ¶ 26. Finally, Plaintiff asked whether Pitchford understood—then turned around and walked away. Wesolowski Dep., at 147:2-3. Afterward, Pitchford was not shaken up or emotionally harmed, and he was able to proceed with his normal duties. Dkt. No. 71-3 ¶ 24.

Unbeknownst to Plaintiff at the time, Humkey was behind Pitchford's inquiries. It was he who noticed that instructors were missing and sent Pitchford there to account for the absent instructors. Dkt. No. 71-3 ¶ 36. After checking in, Pitchford called him and told him Plaintiff was there and that he also was there "covering" for another instructor. Id. ¶ 37.

Later, Pitchford came to Humkey "physically shaken and upset," told him what Plaintiff said, and told him that Plaintiff "entered his 'space' and was standing in a confrontational manner, as if he [was] going to hit" him.[11] Id.

---

[11] Plaintiff denies the substance of Humkey's testimony and asserts that it conflicts with Pitchford's recollection of events and how he felt afterward. Dkt. No. 71-3 ¶ 38. At his deposition, Pitchford testified that Plaintiff's actions were unprofessional and that he did not know whether Plaintiff would throw a punch (or "what [Wesolowski] was going to do"). Pitchford Dep., at 28-29. Although Humkey asked Pitchford to write a statement and Pitchford thought that "some type of contact" was necessary for there to be an incident of workplace violence, it had gone through Pitchford's mind that it might qualify as such an incident. See id. at 40. Regardless, the slightly different recollections of Pitchford's emotional state following the incident

¶ 38. According to Humkey, Pitchford also indicated that he felt physically threatened. According to Pitchford, however, he "didn't think a whole lot about" the incident, and it was Humkey who stated that a violence in the workplace report should be filed. Id. ¶¶ 24, 39.

### 5. Management Inquiry of Workplace Violence

After talking to Pitchford, Humkey referred him to the workplace violence directive, spoke with one of FLETC's attorneys, and then followed the process outlined in the directive.[12] Id. ¶ 40. Humkey met with Plaintiff on September 18, told him that Pitchford had reported that he felt threatened in the incident, and explained that he would have to report this

---

are neither material to nor dispositive of Defendant's motions. See infra Parts IV.B and IV.C.

[12] Each sentence of this paragraph was denied by Plaintiff based on the workplace violence directive not supporting Humkey's actions and Humkey having discretion whether to refer the matter to FLETC security. Dkt. No. 71-3 ¶¶ 40-42. In the portion of the record cited by Plaintiff, Humkey admits that he did not make a determination about whether an act of violence had taken place, but instead "made an overall assessment that [Pitchford] was emotionally upset" and "in fear of being physically harmed." Humkey Dep., at 45:14-19, 47:12-16, 49:21-24. Humkey admits that in making an assessment that there was a threat of violence warranting a report to the Office of Security, he had discretion, which he used based on the totality of the circumstances. Id. at 46:11-22. Although Plaintiff contends that Humkey's report to the Office of Security was unsupported by FLETC's workplace violence directive, the directive clearly countenances some discretion to supervisors to respond to reports of perceived threats of violence. See, e.g., 71-18, Ex. 13, at 382-83 (stating that intimidating behavior, even if not intended to threaten physical harm, is unacceptable and "will result in appropriate corrective action"), 386-87 (requiring supervisors to report an incident to the Chief Security Officer if there has been a threat to do harm, with the response depending on (1) "the attendant circumstances in which the threat was made," (2) whether the employee believed the threat may actually be carried out, (3) whether the threat was taken seriously, and (4) any conditional nature of the threatening statements). Clearly, the workplace violence directive affords some discretion to assess reported threats of violence, but requires that a report be made to the Chief of Security if there is a threat of violence, even if a perpetrator is unlikely to act on it. See id. at 386-87.

21

as a possible incident of workplace violence.  Id. ¶ 41.  Humkey explained to Plaintiff that under a FLETC directive, he had no choice but to report this so that an inquiry could be made.  Id. ¶ 42.

Humkey told Wesolowski that he had to provide a written account of the incident with Pitchford, and Wesolowski agreed to provide one because he wanted to make sure that his side was represented in the report.  Id. ¶ 43.  Plaintiff then put Humkey "on notice" that he had "filed an EEO" about a "hostile work environment" that occurred prior to Humkey's arrival in TAB. Id. ¶ 44.  Plaintiff posited that Pitchford's workplace violence report was made in retaliation and that "everyone else" was aware of this.  Id. ¶ 45.

Humkey stated that he did not know what Plaintiff was talking about, that this was the first he had heard of him having any problems or issues, that he was new to TAB, that he purposely had not asked about any history of disputes in TAB, and that everyone had a clean slate with him.  Id. ¶ 46.  But, Wesolowski denies that Humkey's statements were true because Wesolowski believes that it was standard procedure to discuss these matters in Humkey's briefing when he took over the branch; further, Wesolowski thinks that knowledge of these incidents is implied from Humkey telling Plaintiff that he "ha[s] got a clean

AO 72A
(Rev. 8/82)

slate with [Humkey]."[13]  Id. ¶ 46; Dkt. No. 71-43 ¶¶ 35-36.
Humkey stated more than once that he would be happy to work with
Plaintiff to resolve past issues, although Plaintiff denies that
he subsequently did anything to help; in fact, Plaintiff claims
that Humkey inflamed the situation by encouraging Pitchford to
file a violence-in-the-workplace report.  Dkt. Nos. 71-3 ¶ 47;
71-43 ¶ 37.

Plaintiff stated more than once that Humkey was not a part
of the past problems, and he specifically declined to disclose
the nature of those problems to Humkey when asked to do so.
Dkt. No. 71-3 ¶ 48.  Plaintiff told Humkey that he was not
accusing Humkey of any prior wrongdoing.  Id. ¶ 49.  Humkey
stated that he had made no judgment as to Pitchford's workplace
violence claim, that he would have preferred to resolve the
issue without reporting it as the directive required, and that
he would recommend that the issue be resolved at his level.[14]
Id. ¶ 50.  In regard to Plaintiff's EEO inquiry, Humkey
explained that he knew nothing about it[15] and told Plaintiff to
do what he felt he had to do.  Id. ¶ 51.

---

[13] See infra Part I.D.1.
[14] The substance of Humkey's statement was denied by Plaintiff based on the
workplace violence directive not supporting Humkey's actions and Humkey
having discretion whether to refer the matter to FLETC security.  Dkt. No.
71-3 ¶¶ 40-42.
[15] Plaintiff denies that Humkey had no knowledge.  Dkt. No. 71-3 ¶ 51.

AO 72A
(Rev. 8/82)

### 6. Resolution of Workplace-Violence Accusation

On September 24, 2008, Humkey and Melvin met with Plaintiff
and notified him that the incident with Pitchford did not rise
to the level of workplace violence.  Id. ¶ 53.  Humkey
complimented Plaintiff on his work and reiterated that he knew
nothing about Plaintiff's past problems.[16]  Id. ¶ 54.

In response, Wesolowski asserted that Pitchford was
invading his privacy by talking to their peers about
Wesolowski's "business" and keeping tabs on his whereabouts.
Id. ¶ 56.  Humkey pointed out that Pitchford may on occasion
have to determine where people are as the scheduler of
instructor assignments.  Id.  Plaintiff protested that Pitchford
had planned the encounter, saying that he had "planned on any
interaction whatsoever [so] that he could [talk] to somebody and
say [that Wesolowski] invaded [his] space and threatened [him]."
Id. ¶ 57.  Humkey said he could talk to Pitchford about that.
Id. ¶ 58.  Humkey asked whether Plaintiff and Pitchford could
then agree in person to work together professionally, and
Plaintiff responded, "I don't want Bob Pitchford having one
reason to come near me."  Id. ¶ 59.  Humkey explained again that
as scheduler, Pitchford might need to interact with Wesolowski.
Id. ¶ 60.

---

[16] Plaintiff denies that he had no knowledge.  Dkt. No. 71-3 ¶ 54.

AO 72A
(Rev. 8/82)

Melvin asked what Plaintiff saw as a solution, and
Plaintiff said he wanted Pitchford to "go someplace else." Id.
¶ 61.  Melvin said he would not transfer one without
transferring the other, and he could not afford to lose two
people.  Id. ¶ 62.  Melvin explained, "I want to be able to sit
down and go back to my bosses and say hey, we talked to them,
and they said they can be men and be professional and get over
this."  Id. ¶ 63.  Plaintiff advised that he could work
professionally with Pitchford and that Pitchford could contact
him on his computer or by phone but "[i]f he has something that
he wants to tell me and gets anywhere near [me, then] I really
don't like that.  I don't want him near me."  Id. ¶ 64.

Later the same day, Humkey and Melvin met with Plaintiff
and Pitchford.[17]  See id. ¶ 69.  Melvin stressed the need to work
professionally and granted Plaintiff's request to limit
interaction with Pitchford to emails and telephone.[18]  Id. ¶ 71.
Wesolowski agreed that he could interact professionally with
Pitchford, although he did not want to have to provide leave
slips or correspondence to Pitchford or have any discussions
regarding scheduling.  Id. ¶ 72.

---

[17] Plaintiff secretly recorded this meeting.  Dkt. No. 71-3 ¶ 69.
[18] Despite this concession, Plaintiff claims that Pitchford continued to
harass him by never scheduling Wesolowski as the class coordinator and making
it difficult for Wesolowski to take a requested leave.  Dkt. No. 71-3 ¶ 72;
Dkt No. 71-43 ¶ 38.

AO 72A
(Rev. 8/82)

7. Rods's Interruption of Plaintiff's Class

On September 22, 2008, Senior Instructor Ron Rods "completely" interrupted Wesolowski's class by telling Wesolowski, with students present, to "[w]rap [the instruction] up." Dkt. Nos. 27 ¶ 69; 71-4 ¶¶ 3, 10. Then, five minutes later, he returned and said, "All right, that's about enough. Let's go, let's go, these student[s] got to get trained." Dkt. No. 71-4 ¶ 3. Rods continued: "[N]obody cares what your background is. Nobody care[s] who you used to be or who you think you are . . . ." Id. ¶ 11. Plaintiff asked Rods not to interrupt him, to which Rods replied, "[W]ell, if you would stick to the lesson plan and quit[] going outside of the lesson plan then maybe we'd be on time." Id. ¶ 4. Wesolowski had not gone outside the lesson plan, nor had he exceeded the allotted time for his lesson. Id. ¶¶ 4, 12.

Plaintiff put his lesson on pause, followed Rods into the street, and stopped Rods at a point near students to seek clarification for the reason behind Rods's disruption. Id. ¶ 13. Rods criticized the location and topics of Wesolowski's instruction and reiterated his belief that Wesolowski "need[ed] to stick to the damn lesson plan." Id. ¶ 5. Students heard Rods say, "Quit acting like you're something you're not. Nobody gives a shit about your background. Nobody cares about any of that. You need to stay on track." Id. ¶ 6. Rods was "very

loud, very condescending, very [authoritarian], . . . and very demeaning." Id. ¶ 15. Wesolowski believes that "Rods was just trying to poison [him] in front of [the students]." Id. ¶ 14.

During Melvin, Humkey, and Plaintiff's September 24 meeting to discuss the workplace-violence inquiry's resolution, Plaintiff notified management of the incident. Id. ¶ 1. Humkey and Melvin asked standard follow-up questions. Id. ¶ 2. Humkey promised that he would talk to Rods about the incident. Id. ¶ 7. Plaintiff told Melvin and Humkey that he was not seeking punishment of Rods, but he claims that he wanted management to address the incident somehow. Id. ¶ 8. Wesolowski said what Rods did was "way worse than anything that occurred out there between [him] and Pitchford," and now claims that management's different responses to the incidents shows that he was treated more harshly. Id. ¶ 8; Dkt. No. 71-43 ¶ 28.

D. Second Selection Process

1. New Vacancies and Decision to Use New List

On September 9, 2008, FLETC EOD announced two new Senior Instructor positions ("the September Positions"). Dkt. Nos. 71, at 16; 71-3 ¶ 90. Applications were open to FLETC staff and candidates from other statutory appointing authorities. Dkt. Nos. 71-3 ¶ 91; 56-4, at 1. For this announcement, applications from Plaintiff, Barber, and Donald Glisson, among others, were placed on the certificate of eligibility. Dkt. No. 71-3 ¶ 92.

AO 72A
(Rev. 8/82)

New applicants were solicited despite the fact that the certificate of eligibles for the May Announcement, originally scheduled to expire on July 18, was extended to September 18. Id. ¶ 6.

Humkey testifies that it was his decision to make a new announcement, and it was his preference to open the position to applicants from outside FLETC. Id. ¶ 93. He "wanted a pool of applicants which reflected current interest in the positions and [candidates'] current skills and application information." Id. ¶ 94. In deciding to make this announcement, Humkey swears that he was neither aware of nor influenced by Plaintiff's EEO activity. Id. ¶ 95.

The same day that Crabill's selection was announced, Plaintiff approached Humkey in a FLETC parking lot.[19] Id. ¶ 10. Plaintiff asked Humkey why he had not been selected over Crabill. Id. ¶ 11. Humkey explained that he had not participated in the interviews for that selection; that he had inquired how "the guys" in TAB had done in the interviews; and that he was relaying what he was told, which was that the panel thought Plaintiff "strayed off the questions" and "didn't focus on the questions and answer them."[20] Id. ¶ 12. Humkey said he

---

[19] Plaintiff recorded this conversation. Dkt. No. 71-3 ¶ 10.

[20] Plaintiff admits that Humkey made these statements and the following statements in this paragraph, but denies their accuracy. Dkt. No. 71-3 ¶¶ 12, 14-15. Plaintiff argues that these statements conflict with Mossburg's assessment that both Wesolowski and Crabill did well at

was giving this advice so that Plaintiff could "do better next time." Id. ¶ 14. Humkey advised Plaintiff to "tweak his resume" for the next application; to "listen to the questions, think about what your answer is, and then start talking"; and to "be professional" and "be on track" for the next interview. Id. ¶ 15.

When asked by Plaintiff why a new certificate would be used for the September Positions, Humkey said he had decided to request a new vacancy announcement because he had not participated in the prior interviews; the focus previously had been on finding an instructor for a different program; he wanted a "shot" at figuring out the best candidates; and he wanted to "interview the people and look at all the applicants."[21] See id. ¶ 13. Humkey said that two instructors would be hired from the new announcement and told Plaintiff that he had "a clean slate" with him, that he would "shoot straight" with him, and that he would tell him how he did after the interviews if he wished. Id. ¶ 16.

The day before talking to Humkey, Plaintiff was told by Mossburg that for the two promotion positions then open in TAB, he had suggested to Humkey to use the certificate of eligibles from the Crabill selection and that, in response, Humkey told

interviewing and were "even on everything" up until the question about the Active Shooter program. Id.

[21] Plaintiff denies that these statements were true. Dkt. No. 71-3 ¶ 13.

AO 72A
(Rev. 8/82)

him, "no, this was just for the one [selection], and this was before we interviewed anybody." Id. ¶ 17. Mossburg told Plaintiff that "Humkey is very anal about going by rules." Id. ¶ 18.

## 2. General Process

On October 3, 2008, Humkey received a certificate of eligible candidates pursuant to the September Announcement from HR, which included Plaintiff, Barber, Glisson, and others, along with the application materials submitted by the candidates. Id. ¶ 99. Humkey claims that the materials did not show the scores received by the candidates in the ranking and that he did not know the scores. Id. ¶ 100.

Interviews for the September Positions were conducted by Humkey and two branch chiefs outside of TAB, Ronald Spannuth and John Pecko. Id. ¶ 101. Humkey claims that he asked Spannuth and Pecko to assist him in interviewing and evaluating the candidates because they were unlikely to know the candidates.[22] Id. Humkey provided them the application packages and a list of questions, written by Humkey, to be asked in the interviews. Id. ¶ 102. The same questions were asked of each candidate, with the members of the interview panel taking turns asking the

---

[22] In fact, Spannuth and Pecko have denied having any knowledge about candidates' EEO activity. Dkt. No. 71-3 ¶ 112.

questions and writing their notes from the interviews on prepared forms.  Id. ¶ 103.

The panel interviewed Barber, Glisson, Plaintiff, and others on October 14, 2008.  Id. ¶ 111.  After the interviews and a period for consideration, the panel members met to discuss their recommendations.  Id. ¶ 104.  The panel discussed and evaluated how the various applicants performed and what they said.  See id. ¶ 101.  Humkey swears that he did not seek to influence Spannuth and Pecko about their recommendations and asked that they speak openly and frankly, but Plaintiff denies that the selection was free from Humkey's retaliatory influence or based on legitimate factors.  Id. ¶ 105.  Both Spannuth and Pecko declare that the selection process was proper.  Id. ¶ 112.

3. Considerations for Selecting the Top Candidates

Humkey swears that after discussion, the panel members revealed their first pick, and all chose Barber; they then revealed their second pick, and all chose Glisson.  Id. ¶¶ 106, 108.  Each panel member testifies that they all ranked Plaintiff as the fourth pick, which Plaintiff finds suspect given that he was now ranked behind Barber despite being ranked ahead two months earlier and that Glisson had even not scored high enough to be eligible for the May Position.  Id. ¶¶ 107-108, 112.  Further, each panel member testifies that whether any candidate had made complaints to management and whether any candidate had

31

engaged in EEO activity were not discussed or considered, nor would have it mattered if they had known. Id. ¶¶ 109-110, 112.

The panel members justified not selecting Plaintiff for one of the September Positions because of the candidates' comparative experience, how well questions were answered, Plaintiff's unprofessional demeanor during the interview, and their opinion that Plaintiff seemed somewhat stubborn and narrow-minded about his views. Id. ¶¶ 113-115. For example, when asked to identify his greatest weakness, Plaintiff said that he cannot take "no" for an answer. Id.

In regard to Humkey's testimony about the selection process and factors considered, Plaintiff asserts that Humkey's explanations are inconsistent. Id. ¶ 115. For example, although he claimed that Wesolowski did not have the same level of writing experience and tactical course development as the selected candidates, he later admitted that Wesolowski's background had tactical aspects. Id. Further, although Glisson's law enforcement experience was emphasized, Wesolowski also had significant law enforcement experience. Id. In essence, Plaintiff challenges how the panel assessed the candidates' relative qualifications.

4. Second Selections Finalized

Humkey made his recommendations to Melvin on October 15, 2008, and Melvin made his selections the same day. Id. ¶ 119.

Although Melvin swears to not knowing about or making any decisions based on any EEO complaint by Plaintiff, Melvin met with an EEO counselor on October 2—almost two weeks before the decision. Id. ¶ 120. Melvin swears that he made his decisions based upon what he believed to be "the observably best qualified candidates," and on the fact that Plaintiff was not determined to be one of the two best qualified candidates. Id. ¶ 121. The selections were approved by Robert E. Ray, Deputy Assistant Director of the Office of Training Operations, on October 17, 2008.[23] Id. ¶ 122.

E. Aftermath of Second Selection Process

    1. Filing of Formal EEO Complaint

On October 27, 2008, with the assistance of counsel, Plaintiff presented a formal administrative EEO complaint stating claims of physical-disability discrimination and of "retaliation/reprisal." Dkt. No. 71-2 ¶ 95. He identified September 22, 2008, when Rods interrupted class, as being the date of the most recent discriminatory event. Dkt. No. 71-12, at 3. The complaint lists several instances showing conspiracy to attack Wesolowski's character and damage his career. Id. at

---

[23] Ray swears that in his role as a senior management official with oversight responsibilities as to approximately 450 instructors, he did not personally examine all applicant packages for senior instructor positions but instead relied upon his "Division Chiefs and Branch Chiefs to compare the applicants' strengths and weaknesses." Dkt. No. 71-3 ¶ 123. Further, he did not know whether Plaintiff or the selectees had engaged in prior EEO activity, and whether they had done so was not a factor in his actions. Id. ¶ 124.

AO 72A
(Rev. 8/82)

6. Initially, this consisted of "attacks on [his] appearance, hair, [and] earrings" and fabricated comments about his ability to teach. Id. Wesolowski also cited the issues with Crabill and Smith's uniform policy. Id. at 6-7.

Almost a month after he filed his original EEO complaint, on November 28, 2008, Plaintiff made his first explicit contention that the incidents around April 2008 were based on gender; before, he had only noted that he was singled out for having long hair and wearing earrings. Dkt. No. 71-2 ¶ 103. Plaintiff said that there were no women working in TAB at that time and that "the harassment [was] motivated by general hostility to the presence of same-sex competition in the workplace existing predominantly of men." Id. ¶ 104.

2. Email from Rods

On December 12, 2008, Rods sent an email to Humkey and Plaintiff, which read in its entirety:

> Sorry to throw this at you just coming back, but I think this is something I need to bring up of [sic] the sake of the branch. On the morning of 12-11-08, I entered the warehouse to finish teaching a CBPI class. When I entered the warehouse I saw Chris W [sic]

Dkt. No. 71-4 ¶ 20. Although the email said nothing about seeing Plaintiff sitting down and eating candy while conducting

AO 72A
(Rev. 8/82)

training, Plaintiff later learned that the email was about such an allegation.[24]  Id. ¶ 21; Dkt. No. 71-43 ¶ 29.

### 3. Plaintiff's Request to be Transferred

Plaintiff went to Melvin about Rods's email.[25]  Dkt. No. 71-4 ¶ 22.  Melvin listened to Plaintiff's explanation that Rods had sent to Wesolowski an incomplete email that was intended for Humkey.  Id. ¶ 23.  Melvin asked if Plaintiff had discussed this with Rods to find out what it meant; Plaintiff had not.  Id. ¶ 24.  Given Rods's previous confrontation with him, Plaintiff did not think that it would be appropriate to approach Rods about the email himself.  Id.

Plaintiff said that he believed that the email was more evidence of people constantly watching and following him and that someone was encouraging them to do it; Plaintiff said he did not know if this was being caused by Melvin or Humkey.  Id. ¶ 25.  Melvin advised Wesolowski that he "didn't appreciate" Plaintiff's questioning whether Melvin was involved in Rods's surveillance.  Id. ¶ 26.  Further, he denied that anyone in management was having others report to him, and he said that he did not care what Wesolowski did as long as he was doing his

---

[24] Rods later testified that he saw Wesolowski "slouched down in a rolling chair with his feet propped out in front of him with a lollypop in his mouth." Dkt. No. 71-4 ¶ 38.  Students independently brought it to his attention, so Rods thought it would be better to notify Humkey before it reached him through student critiques.  Id.  Wesolowski denies that this accurately describes the incident or Wesolowski's teaching style.  Id.
[25] Plaintiff secretly recorded this conversation.  Dkt. No. 71-4 ¶ 22.

AO 72A
(Rev. 8/82)

job.  Id. ¶ 27.  Melvin said that this was the first time that

it had been brought to his attention that Wesolowski felt like

people were watching him.  Id.  In response to Wesolowski's

asking whether management was involved in Rods's activity,

Melvin said, "Well, I don't have a problem with anybody asking a

question, but it does kind of—I won't say infuriate [me].  It

kind of agitates [me] to know that you would think that I would

do that.  You've worked for me for what, a year and a half, two

years."  Id. ¶ 32.  Rods swears that he was never instructed to

watch Plaintiff and report back to Humkey, did not email

Plaintiff to harass him, and did subsequently talk to Humkey

about the email, with Humkey telling him "to personally bring

things to his attention in the future and not to put them in an

email."  Id. ¶ 40.  Plaintiff notes that Humkey did not file a

violence-in-the-workplace complaint or instruct Wesolowski that

he should do so, as he previously did with Pitchford.  Id. ¶ 41.

Plaintiff asked to be transferred back to the Firearms

Division, and Melvin said he would contact people to get

Plaintiff transferred.  Id. ¶ 28.  Plaintiff acknowledged that

he would "appreciate it."  Id. ¶ 34.  Plaintiff claims that in

response to Plaintiff's request to be transferred was the only

time that Melvin was helpful to Wesolowski.  Id.

At the end of the conversation, Melvin reiterated that "I

ain't going to be asking somebody to do something behind your

AO 72A
(Rev. 8/82)

back or any of that bull. . . . I have 16 years with the Government and I ain't never worked that way in my entire life, and I don't ever intend to be that way." Id. ¶ 35. Although Wesolowski did not ask for any action but to arrange a transfer, he expected Melvin to question Rods about the email rather than direct Plaintiff to confront Rods. Id. ¶ 36. Thereafter, Wesolowski was transferred to the Driver and Marine Division. Dkt. No. 27 ¶¶ 93-94.

## II. Procedural Background

Wesolowski first sought EEO counseling on September 14, 2008, and filed his first formal complaint on October 27, 2008. Id. ¶ 96. The EEOC dismissed his case on July 5, 2011, and took Final Action on the EEOC's dismissal on October 27, 2011. Id.

On October 3, 2011, Wesolowski filed suit against Defendant Janet Napolitano, Secretary of the United States Department of Homeland Security, and filed an amended complaint ("the Complaint") on April 17, 2012. See Dkt. Nos. 1; 27. In the Complaint, Plaintiff alleges three counts of reprisal under Title VII, which are premised on non-selection from his June interview (Count 1), non-selection from his October interview (Count 2), and other materially adverse actions (Count 3). Dkt. No. 27 ¶¶ 98-127.

AO 72A
(Rev. 8/82)

On April 24, 2013, Defendant filed three motions for summary judgment, one for each count of Plaintiff's Complaint.[26] Dkt. Nos. 55; 56; 57. Defendant's motions have been fully briefed. Dkt. Nos. 55; 56; 57; 62; 63; 64; 71; 75; 76.

## III. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Investor Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute over such a fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In making this determination, the court is to view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000).

---

[26] On May 1, 2013, Plaintiff filed a motion to strike Defendant's motions for summary judgment, arguing that the number of pages in Defendant's motions is excessive and abusive. Dkt. No. 59. In the alternative, he asked for an extension of time to respond. Id. Defendant did not oppose the motion for an extension of time to respond, and Plaintiff filed an opposition to Defendant's motions on June 7, 2013. Dkt. Nos. 67; 71. The Court has reviewed the parties' briefs and does not find Defendant's motions to be excessive. Therefore, Plaintiff's Motion to Strike is **DENIED**. Dkt. No. 59.

AO 72A
(Rev. 8/82)

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To satisfy this burden, the movant must show the court that there is an absence of evidence to support the nonmoving party's case. Id. at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

## IV. Discussion

### A. Count 1: Retaliation Based on the May Position

#### 1. General Legal Framework Under Opposition Clause

Wesolowski's first count concerns his non-selection for the May Position, which he alleges was done in violation of Title VII's opposition clause. See Dkt. No. 27 ¶¶ 98-107. The opposition clause makes it unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by [Subchapter VI]." 42 U.S.C. § 2000e-3(a). At the time of the selection for the First Position, Wesolowski alleges that he had opposed his colleagues' derogatory comments about his appearance, but had not yet participated in the EEO process. Thus, this first count is made only under the opposition clause of § 2000e-3(a) and not the participation clause, which prohibits discrimination because

AO 72A
(Rev. 8/82)

an employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." See 42 U.S.C. § 2000e-3(a).

To establish his prima facie case for a retaliation claim under Title VII, "the plaintiff must show that (1) []he engaged in statutorily protected activity, (2) an adverse employment action occurred, and (3) the adverse action was causally related to the plaintiff's protected activities." Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 959 (11th Cir. 1997). For claims based on the opposition clause, a plaintiff must also establish "that he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." Id. at 960. This requirement contains both a subjective and objective component; "[a] plaintiff must not only show that he subjectively (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was objectively reasonable in light of the facts and record presented." Id. (emphasis in original).

If a plaintiff establishes a prima facie case under the opposition clause, then an employer may rebut the prima facie case "by articulating legitimate reasons for the employment action, whereupon the plaintiff must prove [at trial] by a preponderance of the evidence that the employer's articulated reasons constitute a pretext for discrimination." Bigge v.

40

_Albertsons, Inc._, 894 F.2d 1497, 1501 (11th Cir. 1990) (per curiam). If a claimant cannot show that protected activity was a but-for cause of the employer's alleged adverse action, then the retaliation claim must fail. _Univ. of Tex. Sw. Med. Ctr. v. Nassar_, 133 S. Ct. 2517, 2534 (2013).

### 2. Prima Facie Case

#### a. Adverse Employment Action

First, Plaintiff must demonstrate an adverse employment action. Denial of a promotion constitutes an adverse employment action. _Pennington v. City of Huntsville_, 261 F.3d 1262, 1267 (11th Cir. 2001). Therefore, this prong is met.

#### b. Causation

Second, Plaintiff must show that "the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." _McCann v. Tillman_, 526 F.3d 1370, 1376 (11th Cir. 2008) (quoting _Gupta v. Fla. Bd. of Regents_, 212 F.3d 571, 590 (11th Cir. 2000)) (alterations omitted). When a panel makes a decision, a plaintiff must show that a majority of the panel was wrongly motivated. _See Thomas v. Richmond Cnty. Sch. Dist._, No. CV 107-092, 2008 WL 4857521, at *10 (S.D. Ga. Nov. 6, 2008). Further, on a motion for summary judgment, close "temporal proximity may be sufficient to show that the protected activity and the adverse employment action were not wholly unrelated for a _prima_

41

facie case." <u>Gerard v. Bd. of Regents of State of Ga.</u>, 324 F.
App'x 818, 826 (11th Cir. 2009) (per curiam) (quoting <u>McCann</u>,
526 F.3d at 1376) (alterations and internal quotation marks
omitted); <u>but see</u> <u>Drago v. Jenne</u>, 453 F.3d 1301, 1308 (11th Cir.
2006) (finding that reliance on a three month proximity between
a protected activity and adverse employment action is
insufficiently proximate for a non-movant to show causation on a
motion for summary judgment).

Here, Plaintiff's interview occurred within two months
after complaining to Lambraia. A majority of the panel,
consisting of Lambraia and Mossburg, knew that Plaintiff had
filed complaints against coworkers for harassing Plaintiff about
his earrings and hair. Dkt. Nos. 71-16, Ex. 11; 71-32, Ex. 27,
at 3. Despite these panel members' testimony that they did not
realize that Plaintiff had engaged in protected activity and did
not consider such activity, the Court will credit the temporal
proximity as establishing sufficient evidence of causation.

c. Statutorily Protected Activity

Despite Plaintiff meeting two parts of his prima facie
case, the Court finds that he has not met his burden to show
that he was engaged in statutorily protected activity. For
opposition clause claims, Plaintiff must show "that [the
plaintiff] had a good faith, reasonable belief that the employer
was engaged in unlawful employment practices." <u>Little</u>, 103 F.3d

AO 72A
(Rev. 8/82)

at 960. This requirement contains both a subjective and objective component: "[a] plaintiff must not only show that he _subjectively_ (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was _objectively_ reasonable in light of the facts and record presented." Id. (emphasis in original). "The belief must also be measured against substantive law at the time of the offense." Lipphardt v. Durango Steakhouse of Brandon, Inc., 267 F.3d 1183, 1187 (11th Cir. 2001) (citation omitted). Plaintiff premises his opposition activity on a sex-based hostile work environment; therefore, the inquiry "necessarily means that plaintiff had to have held an objectively reasonable belief that [the complained of] behavior amounted to illegal sexual harassment." Hudson v. Norfolk S. Ry. Co., 209 F. Supp. 2d 1301, 1311-12 (N.D. Ga. 2001).

For a hostile environment claim premised on sexual harassment, Plaintiff must prove "that the harassment was sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1351 (11th Cir. 1999) (quoting Watkins v. Bowden, 105 F.3d 1344, 1355 (11th Cir. 1997) (per curiam)). "In deciding whether a hostile environment was created factors to consider include [1] the frequency of the discriminatory conduct, [2] the severity of the

discriminatory conduct, [3] whether the conduct is threatening or humiliating, and [4] whether the conduct unreasonably interferes with the plaintiff's performance at work." Edwards v. Wallace Cmty. Coll., 49 F.3d 1517, 1521-22 (11th Cir. 1995). An employer is liable "if it fails to discover a hostile atmosphere and to take appropriate remedial steps." Id. at 1522. However, "Title VII is not a federal 'civility code,'" and simple teasing or non-serious isolated incidents do not amount to discriminatory changes of employment's terms and conditions. Mendoza v. Borden, Inc., 195 F.3d 1238, 1244-45, 1273 (11th Cir. 1999) (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)).

For a claim based on gender stereotyping, the stereotyping must be "stereotyping based on the qualities, behaviors, and personality features that have been traditionally assigned to [one's sex]." Mowery v. Escambia Cnty. Utils. Auth., No. 3:04CV382-RS-EMT, 2006 WL 327965, at *6 (N.D. Fla. Feb. 10, 2006). "[A] claim under Title VII could be stated if [the plaintiff can] show that the harassment he allegedly suffered was based on his perceived failure to conform to a masculine gender role." Id.; see also Hudson, 209 F. Supp. 2d at 1315 ("Although behavior need not be sexual in nature to support a claim of hostile work environment based on gender, the behavior must be based on gender . . . ."). As to claims based on hair

AO 72A
(Rev. 8/82)

length, it is objectively unreasonable to believe that a grooming policy is sex-based discrimination actionable under Title VII. See Harper v. Blockbuster Entm't Corp., 139 F.3d 1385, 1389 (11th Cir. 1998); Campbell v. Ala. Dep't of Corr., No. 2:13-CV-00106-RDP, 2013 WL 2248086, at *2-3 (N.D. Ala. May 20, 2013).

The Court holds that Plaintiff did not have a subjective and objectively reasonable belief that he was opposing an unlawful employment practice. First, Plaintiff has not shown that the complained of incidents resulted from his sex or gender non-conformity, and also failed to reference protected characteristics in making complaints. See Birdyshaw v. Dillard's Inc., 308 F. App'x 431, 436-37 (11th Cir. 2009) (per curiam) (granting summary judgment against a plaintiff who failed to reference a protected characteristic when opposing alleged discrimination); Fonseca v. Comm'r of Soc. Sec., No. 8:11-cv-1800-T-30EAJ, 2013 WL 500150, at *5-6 (M.D. Fla. Feb. 11, 2013) (dismissing a retaliation claim as a matter of law when the email serving as the basis for the claim did not mention a protected characteristic under Title VII). For no incident did Plaintiff allege that his coworkers perceived him as being feminine rather than masculine, and the Court can infer no such perception from the record. Clearly, Pitchford's rumors

AO 72A
(Rev. 8/82)

about Plaintiff holding himself out to be an undercover agent[27] had no basis in Plaintiff's gender.  The most plausible instances of harassment involve Crabill's and Smith's criticism of Plaintiff's appearance.  Indeed, sex-stereotyping based on Plaintiff's hair and earrings may be actionable when motivated by gender non-conformity, but Plaintiff offers no evidence that the comments were based on gender non-conformity.  To the contrary, Plaintiff and Defendant agree that to the extent criticism was voiced about long hair and earrings, it was voiced because Plaintiff was trying to look like a "bad-ass biker undercover agent"—not a girl.

In his affidavit, Plaintiff says that the basis for his sex discrimination complaint was that "[t]he comments by Tom Crabill were discriminatory, male against male.  Comments about my hair and earring would not have been made if I were [a] wom[a]n.  The constant reminders of my hair and earring were tantamount to harassment based on my appearance."  Dkt. No. 71-14, Ex. 9, at 9.  Plaintiff goes on to assert that "numerous claims to others and personally to me regarding my physical appearance were made in an attempt to substantiate the claims that I was undercover, which eventual[ly] led me into becoming the subject and target

---

[27] In Plaintiff's April 15 email to Lambraia, Plaintiff complained about Pitchford's spreading rumors and the damage that would be caused to Plaintiff's reputation—concluding that "[s]uffice [i]t to say this has in fact become a hostile work environment for [him]."  Dkt. No. 55-12, Ex. H.  Nowhere, however, was there any reference to Plaintiff's gender or sex.

AO 72A
(Rev. 8/82)

of a FLETC Uniform Regulation Policy revision by Brad Smith to

the Director of FLETC, Connie Patrick." Id. at 18. Further,

according to Crabill, when he asked Plaintiff about his

grooming, he said that Plaintiff "look[ed] like some Billy bad

ass biker undercover agent," not that Plaintiff looked feminine.

Dkt. No. 55-8, at 2. This representation of the conversation is

in accord with Plaintiff's testimony. Wesolowski Dep., at 35-

44.

Without a discriminatory motive based upon a protected

characteristic, appearance discrimination is not actionable,

especially in regard to neutral characteristics, such as hair.

Further, even if his opposition had a basis in gender non-

conformity that was communicated to management, the activity

complained of was neither sufficiently severe nor pervasive to

alter the conditions of employment and thus create an objective

basis to believe he was subject to a hostile work environment.

See Murphy v. City of Aventura, 383 F. App'x 915, 918 (11th Cir.

2010) (per curiam) (affirming summary judgment against a sexual

harassment claim based on nine remarks over three years because

the remarks were not sufficiently severe or pervasive and were

unrelated to a protected characteristic); Hudson, 209 F. Supp.

2d at 1331-32 (finding that conditions of employment were not

altered by rumors and the plaintiff's resulting inquiry into the

rumors). Therefore, Plaintiff did not oppose any employment practice reasonably believed to be unlawful.

However, Plaintiff argues that the first prong is met because (A) the decision makers perceived that Plaintiff was engaged in protected EEO activity and (B) "this Court already held in deciding [D]efendant's prior dispositive motion that [P]laintiff's opposition was objectively reasonable." Dkt. No. 71, at 24-25. As to the latter argument, the Court notes that its ruling on Defendant's motion to dismiss involved a different standard, which accepted all facts in Plaintiff's complaint as true; on this motion for summary judgment, however, Plaintiff has failed to produce evidence to substantiate his claim that a hostile work environment arose from sex stereotyping. See Dkt. No. 27 ¶ 99. As to Plaintiff's management-perception argument, even assuming that the Eleventh Circuit would consider such a theory of retaliation,[28] Defendant has proffered no evidence that Plaintiff's supervisors actually believed that he was engaged in protected activity. Although Defendant cites his supervisors' responses to his complaints as evidence, their actions cannot be contorted backward as proof of their belief that Plaintiff was

[28] The Court is aware of no Eleventh Circuit precedent that has either considered or adopted this theory of retaliation. See Diaz v. Miami Dade Cnty., No. 09-21856-CIV, 2010 WL 3927751, at *6 (S.D. Fla. Aug. 17, 2010) (assuming that a perception theory is valid while ultimately concluding there would be insufficient evidence); Dixon v. Rave Motion Pictures, Inc., No. 2:05CV326-SRW, 2006 WL 3218700, at *2 n.1 (M.D. Ala. Nov. 6, 2006) (stating that as of the date of the court's decision, the theory had not been recognized).

AO 72A
(Rev. 8/82)

engaged in activity. It was standard policy to make an administrative inquiry following complaints of a hostile work environment. Dkt. No. 71-27, Ex. 22, at 8. This inquiry was made, and management consulted proper authorities. Dkt. No. 71, at 24. No hostile work environment was found. If anything, the evidence supports only a finding of management disbelief that Plaintiff was engaged in statutorily protected activity. See Dkt. No. 71-16 ("The results of our interviews have not substantiated your claim of a hostile work environment, or harmful comments that have damaged your reputation."); Wesolowski Dep., at 255:5-10 ("[Lambraia] told me [in person that] none of those [instances] constitute a hostile work environment . . . .").

The record indicates that no rational jury could find Wesolowski's belief that he was opposing unlawful employment actions to be reasonable in light of substantive law, nor that his supervisors denied him promotion as retaliation from their perceptions that he was engaged in protected activity.

3. Legitimate Reasons for Non-promotion

Even assuming that Plaintiff met his prima facie case, Defendant has provided a legitimate, non-discriminatory reason for promoting Crabill rather than Wesolowski. All panel members denied that a candidate's engagement in EEO activity affected their decision. Instead, panel members unanimously justify

their decision based on the candidates' comparative qualifications and Wesolowski's poor interview performance. "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000). Further, a "subjective reason can constitute a legally sufficient, legitimate, nondiscriminatory reason under the McDonnell Douglas . . . analysis." Id. at 1033. Here, legitimate reasons that are clear and reasonably specific were articulated for not promoting Wesolowski based on his demeanor, how he answered questions, and his comparative qualifications. Therefore, Defendant has established a legitimate, non-discriminatory reason for not promoting Plaintiff to the May Position.

4. Pretext and Causation

Plaintiff cannot show that Defendant's asserted legitimate reasons for not promoting Plaintiff are pretextual and that he would have been promoted but-for retaliation to his protected activity. Plaintiff's argument for pretext boils down to comparing his and Crabill's qualifications, temporal proximity, and the asserted contradictions between Mossburg's unsworn conversation and others' sworn testimony. The Court finds these insufficient to show that "a discriminatory reason more likely

50

motivated the employer or . . . that the employer's proffered explanation is unworthy of credence." Whitby v. Sec'y for Dep't of Homeland Sec., 480 F. App'x 960, 964 (11th Cir. 2012).

As to Plaintiff's arguments based on the applicants' comparative qualifications, he "must show that the disparities between [Crabill's] and [Plaintiff's] own qualifications were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." Brooks v. Cnty. Comm'n of Jefferson Cnty., 446 F.3d 1160, 1163 (11th Cir. 2006) (internal quotation marks omitted) (quoting Cooper v. S. Co., 390 F.3d 695, 732 (11th Cir. 2004)). Having compared the relative qualifications, the Court cannot conclude that a rational jury could find that no reasonable person would choose Crabill over Wesolowski based on their qualifications. Even if there was a disparity, this fails to show that the real reason for non-promotion was his EEO activity. See, e.g., Woolsey v. Town of Hillsboro Beach, No. 12-16145, 2013 WL 4766872, at *2 (11th Cir. Sept. 6, 2013) (per curiam) (finding that even if it was shown that stated reasons for an employment action were false, it did not show that the defendant illegally discriminated). Further, a comparison of Mossburg's testimony and secretly recorded statements to Wesolowski does not reveal any sort of "weaknesses, implausibilities, inconsistencies, incoherencies,

AO 72A
(Rev. 8/82)

or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997). Although Mossburg emphasized the Active Shooter Program more to Plaintiff in person and Wesolowski's poor performance more later on during the course of this legal action, this does not give the Court any pause, nor could it for any rational fact finder, that this testimony is so inconsistent as to imply that Defendant's stated reasons are pretexts for retaliation. Rather, the later testimony in a socially distinct context was an elaboration on the reasons for not selecting Wesolowski. See Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1332 (11th Cir. 1998) (stating that later elaboration for why a person was not selected is not sufficient to show pretext). Finally, temporal proximity, while sufficient to show causation in Plaintiff's prima facie case, holds little weight in establishing pretext. See, e.g., Gerard, 324 F. App'x at 826 ("[S]ummary judgment is proper where the defendant offers legitimate reasons and the employee only offers temporal proximity."). Finally, to the degree that Plaintiff seeks to assert that Melvin's email titled "Possible Litigation" shows pretext, the Court finds no basis for this contention because the email's substance did not deal with any of the incidents relevant to Plaintiff's claims. At the very least, Plaintiff

cannot show that retaliation for protected activity was the but-for cause for him not being selected for the May Position. Therefore, Defendant's Motion for Summary Judgment as to Count 1 is **GRANTED**. Dkt. No. 55.

### B. Count 2: Retaliation Based on the September Positions

#### 1. General Legal Framework Under Participation Clause

Wesolowski's second count is in regard to his non-selection for the September Positions, which he alleges was done in violation of Title VII's opposition and participation clauses. See Dkt. No. 27 ¶¶ 108-120. As with Count 1, the McDonnell Douglas framework governs Count 2, although the analysis differs in the type of statutorily protected activity engaged in.

#### 2. Prima Facie Case

##### a. Statutorily Protected Activity

As to whether there was statutorily protected activity, the Court uses a different analysis than that under the opposition clause. In contrast to claims made under the opposition clause, there is no reasonable good faith belief requirement for claims under the participation clause. See Wesolowski v. Napolitano, No. CV 211-163, 2013 WL 1286207, at *6-8 (S.D. Ga. Mar. 25, 2013). Instead, Plaintiff's EEO counseling on September 15, 2008, was sufficient to trigger the participation clause's protection. See Eastland v. Tenn. Valley Auth., 704 F.2d 613, 627 (11th Cir. 1983) (stating that "contacting an EEO officer"

AO 72A
(Rev. 8/82)

is protected activity); Hashimoto v. Dalton, 118 F.3d 671, 680 (9th Cir. 1997) ("Under the participation clause . . . there can be little doubt that [the plaintiff's] visit with the EEO counselor constituted participation 'in the machinery set up by Title VII.'"). By contacting an EEO counselor, Plaintiff was thereafter engaged in statutorily protected activity.

### b. Adverse Employment Action

As with Count 1, denial of a promotion constitutes an adverse employment action. Pennington, 261 F.3d at 1267. Therefore, this prong is established.

### c. Causation

Finally, in regard to causation, the Court finds that Plaintiff has met his burden, but only barely. Causation requires that an employer be actually aware of protected conduct at the time it took an adverse employment action. See Griffin v. GTE Fla., Inc., 182 F.3d 1279, 1284 (11th Cir. 1999) (per curiam). When a group acts as a decision-maker, a majority of the group must act with improper purpose to trigger liability. See Rolle v. Worth Cnty. Sch. Dist., 128 F. App'x 731, 733 (11th Cir. 2005) (per curiam) (affirming summary judgment on a Title VII retaliation claim because the plaintiff "failed to show that a majority of the Board was motivated by an improper purpose"); Matthews v. Columbia Cnty., 294 F.3d 1294, 1297 (11th Cir. 2002) (per curiam) (finding as a matter of law that the plaintiff must

54

show that a majority of the board held an unconstitutional motive to trigger liability under 42 U.S.C. § 1983). Even if there is evidence of improper motive of one of the group's members, "an improper motive of one member does not impart discrimination on the entire [group]." Rolle, 128 F. App'x at 733.

Humkey was aware of Plaintiff's EEO activity because he was interviewed on a prior occasion in regard to Plaintiff's complaint. The two other panel members have declared that they neither had knowledge of Plaintiff's EEO activity nor were influenced by anyone at FLETC in arriving at a decision. Rather than contest their awareness of Plaintiff's EEO claim, Plaintiff argues that the selection process was not free from Humkey's retaliatory animus. Dkt. Nos. 71, at 34-35; 71-3 ¶ 112. According to Defendant, because the panel members discussed the candidates before finalizing their ranks, Humkey had an "opportunity to influence the other panel members' opinions of Mr. Wesolowski's performance, and ultimately, the selection decision." Dkt. No. 71, at 34-35. Indeed, as Humkey admitted, there was discussion among panel members about candidates before finalizing rankings. Although panel members swore that the process was fair and no one was influenced, and despite the generality of Wesolowski's speculation that Humkey influenced the others' decision, the Court will err on the side of finding

AO 72A
(Rev. 8/82)

that Plaintiff has established causation based on the possibility that panel members may have been influenced by Humkey and the temporal proximity of the Plaintiff's non-selection and filing an EEO complaint. See Gerard, 324 F. App'x at 826. Therefore, Plaintiff has established his prima facie case.

### 3. Legitimate, Non-Discriminatory Reason

Despite Plaintiff meeting his burden to establish a prima facie case of retaliation, Defendant has responded with a legitimate, non-retaliatory reason for not promoting Wesolowski. The panel members testified that an applicant's EEO activity was not discussed or considered in their decision-making. Instead, the panel members unanimously ranked Plaintiff as not one of the top two candidates because of comparative experience, his unprofessional demeanor, and the perception that he was narrow-minded. Further, the Court finds Humkey's desire to be involved in making selections for the September Positions to be a legitimate basis not to use the May Position's list of eligible applicants, with which he was not involved. Therefore, Defendant has established a legitimate, non-discriminatory reason for not promoting Plaintiff to the September Positions.

### 4. Pretext and Causation

Plaintiff cannot show that Defendant's reasons for not promoting him to one of the September Positions are pretextual

56

and that the but-for cause of his non-selection was retaliation for his participation in EEO activity. Plaintiff argues that Defendant's reasons are pretextual given that the EEO complaint and non-selection were temporally close, Humkey allegedly lied about Plaintiff's qualifications and performance, the selection was not insulated from bias, and Plaintiff claims to have superior qualifications among the candidates. Dkt. No. 71, at 33-40.

The analysis here is akin to the discussion of pretext in Count 2. Although Plaintiff cites his allegedly superior qualifications, the Court does not find them to be so one-sided to conclude that no reasonable person would have chosen others over Wesolowski. See Brooks, 446 F.3d at 1163. Further, the Court fails to see how the selection process not being completely insulated from bias can constitute substantive proof that the decision was made in retaliation to Plaintiff's activity. Finally, temporal proximity is insufficient to show pretext, especially as here when the plaintiff could have deliberately timed his complaint shortly before an anticipated employment action. See Gerard, 324 F. App'x at 826; Castillo v. Roche Labs., Inc., 467 F. App'x 859, 862 (11th Cir. 2012) (per curiam) (noting that even at the prima facie stage of the framework, temporal proximity between protected activity and a contemplated adverse action is insufficient to show causation).

AO 72A
(Rev. 8/82)

Therefore, Defendant's Motion for Summary Judgment as to Count 2 is **GRANTED**.  Dkt. No. 56.

    C. Count 3: Other Materially Adverse Actions

        1. Parties' Arguments

Plaintiff raised a claim for three incidents allegedly constituting materially adverse actions: (1) Pitchford's violence in the workplace report; (2) failure to take action against Rods for interrupting Plaintiff's teaching; and (3) failure to take action against Rods for harassing Plaintiff by "surreptitiously reporting on his activities."  Dkt. No. 71, at 41.  Defendant argues that these claims must fail because Plaintiff has not shown that (A) Defendant is directly or vicariously liable or (B) the acts constitute materially adverse actions.  Dkt. No. 57-1, at 11-22.

In response, Plaintiff posits that the timing of Pitchford's report three days after Plaintiff's EEO counseling was meant to dissuade Plaintiff from further activity.  Dkt. No. 71, at 41-44.  Similarly, Plaintiff asserts that management responded inadequately to Rods's interrupting a class and more leniently than to the report of workplace violence.  Id. at 44-45.  Finally, Rods's email, Plaintiff argues, caused him to transfer because Melvin's inadequate response made him realize that Melvin had "turned against him too."  Id. at 45-46.  Plaintiff relies on these incidents individually or collectively

as constituting an adverse employment action and does not argue that they amounted to a hostile work environment.

### 2. Retaliation-Based Adverse Actions

#### a. General Legal Framework

To establish his prima facie case for retaliation under Title VII, "the plaintiff must show that (1) []he engaged in statutorily protected activity, (2) an adverse employment action occurred, and (3) the adverse action was causally related to the plaintiff's protected activities." Little, 103 F.3d at 959. Indisputably, Plaintiff was engaged in statutorily protected activity. See Eastland, 704 F.2d at 627 (concluding that contact with the EEO counselor was itself protected activity). Nevertheless, even assuming that Plaintiff can establish causality between the incidents and his EEO activity—a generous assumption in light of the evidence—the actions are too trivial to rise above the level of substantiality required to constitute an adverse employment action, individually or as a whole.

#### b. Adverse Employment Action

The incidents complained of were too insubstantial to constitute adverse employment actions, individually or collectively, that would dissuade a reasonable person from engaging in EEO activity. To state a retaliation claim, a plaintiff must show that he suffered an adverse employment action. See Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453,

AO 72A
(Rev. 8/82)

1454 (11th Cir. 1998). For a retaliation claim, an action is considered materially adverse and sufficient to support a claim if it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (citation and internal quotation marks omitted); see also Crawford v. Carroll, 529 F.3d 961, 973 (11th Cir. 2008) (finding that the Supreme Court's decision in Burlington "broadened" the type of employer conduct actionable in a retaliation claim).

"Although 'Title VII's protection against retaliatory discrimination extends to adverse actions which fall short of ultimate employment decisions,' the plaintiff must still demonstrate 'some threshold level of substantiality.'" Cotton v. Cracker Barrel Old Country Store, Inc., 434 F.3d 1227, 1233 (11th Cir. 2006) (quoting Wideman, 141 F.3d at 1456). Courts "look to the 'totality of the alleged reprisals' to determine whether this burden has been met." Id. (quoting Wideman, 141 F.3d at 1456). The actions are to be considered collectively; thus, even if an action on its own would not constitute an adverse employment action, when combined with the "total weight" of the actions, the plaintiff's burden may be met. See Shannon v. Bellsouth Telecomms., Inc., 292 F.3d 712, 716 (11th Cir. 2002). The totality of the weight is judged from the viewpoint

AO 72A
(Rev. 8/82)

of a "reasonable person in the circumstances." Cotton, 434 F.3d at 1234.

First, Pitchford's workplace-violence complaint is not a materially adverse action. The Court finds no basis for Plaintiff's unsupported, conclusory assertion that "the seriousness of the false allegations makes it a materially adverse action." Dkt. No. 71, at 44. Instead, the complaint against him does "not constitute an adverse action, because the complaint ultimately was not sustained" and Wesolowski "suffered no harm from the filing of the complaint." Entrekin v. City of Panama City, 376 F. App'x 987, 995 (11th Cir. 2010) (per curiam); see also Humphrey v. Napolitano, 847 F. Supp. 2d 1349, 1354 (S.D. Fla. 2012) ("Many courts hold that an investigation that does not lead to any action taken against the employee is not an adverse employment action sufficient to state a claim for disparate treatment."). Although Plaintiff admits that the report was found false, he complains that Humkey did not take corrective action against Pitchford. Dkt. No. 71, at 43. However, "[m]erely because the Plaintiff may feel that other measures may have been appropriate does not mean that the employer's remedial actions were inadequate." McDaniel v. Merlin Corp., No. CIV.A.1:01CV2992JEC, 2003 WL 21685622, at *11 (N.D. Ga. June 26, 2003). Instead, in the context of a hostile work environment, the Eleventh Circuit has "held that warnings

AO 72A
(Rev. 8/82)

and counseling of the harasser are enough where the allegations are substantiated." Baldwin v. Blue Cross/Blue Shield of Ala., 480 F.3d 1287, 1305 (11th Cir. 2007). Further, Plaintiff cannot rely on failure to take action against another employee to show that he was subject to an adverse employment action. Entrekin, 376 F. App'x at 995. Therefore, Plaintiff's complaint based on Pitchford's report of workplace violence is without merit.

Second, the alleged failure to discipline Rods also does not constitute an adverse employment action. In support of his contention that management's comparative treatment of incidents is evidence of reprisal, Plaintiff cites Burke-Fowler v. Orange County, 447 F.3d 1319 (11th Cir. 2006) (per curiam). However, Burke focused on the plaintiff's dismissal for conduct similar to other conduct for which another official was not dismissed, not a comparative inquiry into management remedial actions for which no one suffered an adverse employment action. See id. at 1323-26. As with management's response to Pitchford's complaint of workplace violence, failure to take action against other individuals does not constitute an adverse employment action because Wesolowski suffered no harm. Entrekin, 376 F. App'x at 995. It is not apparent what greater remedial action Plaintiff sought from management given the fact that he had told Melvin and Humkey that he was not seeking punishment of Rods. Further, as to the Rods action itself, assuming liability could be

AO 72A
(Rev. 8/82)

imposed for it directly, the Court finds that it was insubstantial—a "petty slight" or "minor annoyance" that would not deter a reasonable person from pursuing EEO activity. White, 548 U.S. at 68.

Finally, Plaintiff's similar claim based on failure to take action against Rods for sending an incomplete email must fail. As with the other claims, Plaintiff cannot rely on failure to take action against another employee as constituting an adverse employment action. Entrekin, 376 F. App'x at 995. Again, as to the email itself, it is hard to discern how the email would cause a reasonable employee not to file an EEO complaint. It appears that Plaintiff complains that the incident, as a culmination of incidents over the preceding three months, forced Plaintiff to leave the Tactics Branch. Dkt. No. 71, at 45. Thus, Plaintiff is arguing that he was constructively discharged. Under such a theory, Plaintiff's claim fails, because a "constructive discharge will generally not be found if the employer is not given sufficient time to remedy the situation." Van Der Meulen v. Brinker Int'l, 153 F. App'x 649, 656 (11th Cir. 2005) (per curiam) (quoting Kilgore v. Thompson & Brock Mgmt., Inc., 93 F.3d 752, 754 (11th Cir. 1996)). Within the same conversation notifying Melvin of Rods's email, Wesolowski asked to be transferred. Therefore, management's

AO 72A
(Rev. 8/82)

failure to take further action does not constitute an adverse employment action.

Even when viewed collectively, the incidents do not constitute an adverse employment action because the collective harm suffered from these events is trivial. Therefore, for the foregoing reasons, Plaintiff has not established a prima facie case for retaliation. Defendant's Motion for Summary Judgment as to Count 3 is **GRANTED**. Dkt. No. 57.

## V. Conclusion

For the aforementioned reasons, Plaintiff's Motion to Strike is **DENIED**, Dkt. No. 59, and Defendant's Motions for Summary Judgment are **GRANTED**. Dkt. Nos. 55; 56; 57. The Clerk of Court is instructed to enter an appropriate judgment and close the case.

**SO ORDERED**, this 27TH day of February, 2014.

_____
LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)